The opinion of the Court was delivered by
Dargan, Ch.
The plaintiff charges in her bill that her husband, the defendant, while paying his addresses to her and making overtures of marriage, and before the solemnization of their nuptials, entered into a solemn engagement, that if she would marry him, he would never remove her, without hen-consent, from the neighborhood of her mother, or to a *169 place where she could not enjoy her mother’s society, and that of her friends. On this condition she married him, as she says. Her mother (Mrs. Matheney,) also obtained from him (as it is charged) a similar promise, as the condition of her assent to the marriage. The marriage was celebrated on the 13th October, 1853. From that time the young pair lived with the plaintiff’s mother until the 9th December, 1854, during which period, the plaintiif bore to her husband a daughter, who is the only issue of the marriage. At the last mentioned date, the defendant, with his wife and child, went to live at a place which he had bought, about a half mile distant from that of his mother-in-law, where, as the plaintiif herself says, they “ lived in comfort, peace, and harmony, up to the twenty-seventh day of September, 1857.” This statement appears to be in strict conformity with the truth,'except as relates to some immoralities on his part which had come to her knowledge, and which were condoned on her part by their subsequent cohabitation. After the .plaintiff and defendant had gone to live at their own home, he became restless and dissatisfied, and anxious to remove to Louisiana, to which State some of his near relatives had emigrated. His land was poor, and he wished, as he says in his'answer, to better his condition, by moving to a country where lands were fertile and cheap. But his wife was unwilling to go, positively-refused, and pleaded his solemn engagement and' promise made previous to their marriage. (It may be as well to remark here that, although this promise was denied in his answer, it was satisfactorily proved against the allegations of his answer by witnesses who had heard him speak on the subject— some of them his own witnesses and friends.)' His solicitations to her for her to consent to go with him to the west, amounted to importunity. They had frequent and intemperate altercations on the subject, he insisting that she should accompany him in his move to the west, and she pertinaciously refusing and declaring that she never would leave the place near her mother’s, where she then lived. Perceiving *170 that he could make no impression upon her mind, nor effect any change of her will, he announced to her his determination to go without her, unless she should choose to accompany him. She said he might go and leave her, provided he would leave her the negroes (three in number, the only ones he had, which he had acquired by his marriage with her.) She says in her bill that he consented to this arrangement about leaving the negroes. In his answer he denies it, and there is no further proof. Under these circumstances, and at this stage of the controversy, he commenced making preparations for his departure. He rented his land, sold his crop in the field, some hogs, &c., with the view of raising the necessary funds. Whether his preparations were made secretly, ' as charged in the bill, or not, he did not communicate to her the fact that he was making his preparation, nor his design then to go. She had no reason to - believe that he was going at that particular time. -It took her by surprise. In fact, it would seem that she did not believe that he would go at all, unless she consented to accompany him. Having completed his preparations, on Sunday, the 27th September, 1857, about the hour of midnight, he called his two negro women to the field, under the pretence of driving out the hogs, but, in fact, with the view of securing and carrying them off. He seized them both. They made a great outcry, which reached the 'ear of the plaintiff at the house. The negroes were unwilling to go; one of them (Hagar) made her escape; the other one (Ann) he tied, went to the house and got her young child. He put them both in a conveyance which he had ready, carried them to Blackville, where he put them on the cars that same night, and carried them off to Louisiana, where they yet remain. The plaintiff continued to reside, and still resides, at the same house. The tenant to whom the defendant leased his land (one Darling Hair, his relative,) has not attempted to eject her from the possession. She has with her Hagar, who, immediately after the defendant’s departure, came in to the plaintiff, and continues to serve her; also the *171 furniture that was in the house, some provisions, wheat, flour, &c., and three horses, said by one of the witnesses to be old and of little value. On the eleventh day after the defendant’s departure, the plaintiff filed this bill, setting forth the facts that have been recited, and praying an injunction to restrain him from disturbing her in the possession of the property in her possession, or from selling or disposing of the same, until some adequate provision shall be made by the defendant, under the order of this Court, for the support of the plaintiff and her child.
The defendant, on learning that his wife had filed a bill against him for alimony, immediately returned to South Carolina, filed his answer, and has submitted himself to the judgment of the Court. On his return the defendant visited his wife, and made earnest overtures to her to accompany him to his new home in the Parish of Bienville, in Louisiana, promising to treat her with the kindness and affection due to her as his wife. These overtures were rejected by her with firmness and with passionate disdain; in such a manner, in fact, as to preclude all expectation or hope that a reconciliation could be 'effected between them on the terms proposed. She intimated that she would live with him if he would come back to the place which he had left. She said she would not go with him to the west. to save his life, and that she intended to live and die where she was. The defendant, in his answer, iterates his proposals to take his wife and child with him to his home in the west, and to provide for them to the best of his ability.
These are the undisputed facts of the case, and the question for the court to decide is, whether under these circumstances, the plaintiff is entitled to a decree for alimony. The circuit decree allowed her claim for alimony, and ordered a reference. But we are of opinion, that' the decree cannot be sustained upon the principles which prevail in this Court on the subject.
In the country from which we have derived the most of our *172 civil institutions and laws, the authority to grant alimony appertains alone to the ecclesiastical court; but to that jurisdiction only as incident to a suit for divorce. A, separate suit for alimony, unconnected with an application ‘for divorce, or for the restitution of conjugal rights, was never entertained* During the protectorate of Cromwell, the ecclesiastical courts were abolished, and Courts of Equity for the first time, exercised jurisdiction in hearing cases for alimony, by authority “expressly given to them,” according to Mr. Fonblanque Fonbl. Eq. 96, 97, note. After the restoration of the Stuart dynasty, the ecclesiastical courts were re-invested with all their authority and power. They resumed their jurisdiction in cases of divorce, and its incidents, alimony, &c., and over the marriage relation generally. It does not appear, that after this period, Courts of Equity in England exercised any jurisdiction in cases of this nature.
In South Carolina, at a very early period after the -revolution, the Court of Equity, without any Legislative act, or other authority, began to exercise jurisdiction in cases for alimony, Brown vs. Brown, 1 Eq. R. 196. A. D. 1785, not as in England, as incident to suits for divorce, (for no divorce has ever been allowed in this State,) but as a separate and distinct ground for equitable relief. Julineau vs. Julineau, 2 Des. 45 A. D. 1787.
In Rhame vs. Rhame, 1 McC. Ch. 205, Judge Nott, in delivering the opinion of the Court, uses the following language: “In England, it appears that alimony is allowed only where a separation is decreed. And though our Courts of Equity have not the power to grant divorces, yet as the two subjects, 4 divorce and alimony,’ are inseparable companions in England, we must look to the causes of divorce, to ascertain the grounds on which alimony will be allowed.” I apprehend that the learned Judge meant to say, that alimony would be allowed by our Court of Equity,"only in cases where a divorce would be decreed by the Ecclesiastical Court of England; but not in all cases where that court would grant a divorce. *173 For adultery, there, constitutes a sufficient, and very common ground for a divorce. But there has been no case ' in South Carolina, where adultery of itself has been held, to entitle the wife to a decree for alimony.
When a bill is filed here for alimony on grounds which have been held in this State, to be sufficient to entitle the wife to a decree for such relief, it is proper, and pertinent to enquire, whether in Doctors Commons, the case made would authorize a decree for divorce, Avith its concomitant remedy, alimony* Accordingly, Avhen a suit is instituted in this State for alimony -propter ssevitiam, we look to the decisions of the Ecclesiastical Court, to ascertain what kind and degrep of cruelty entitles the wife in that tribunal to a decree for divorce, and an allowance. FolloAving this guidance, (see D'Aquilar vs. D’Aquilar, 1 Hag. 329,) our Court of Equity, in the case of Rhame vs. Rhame, cited above, held, that no words of reproach and insult amount to legal cruelty; no affront and indignity, no torture of the feelings and sensibilities, however severe, and grievous to be borne, unaccompanied by bodily injury, or a well grounded apprehension of such, will authorize the wife to leave the bed and board of her husband, and to claim thereupon from this Court a decree for alimony. But Avords of menace, intimating a malignant intention to inflict personal injury, that might affect the security of life or health, constitute such legal cruelty, as would justify the wife in with, drawing from the presence of the husband, and claiming against him a decree for alimony. The Court must not wait till the threats are carried into execution, but must interpose where they raise a reasonable apprehension of personal violence, and excite such terror as to make life intolerable.
In pursuance of the decisions and the practice of the Ecclesiastical and Consistorial Courts of England, in South Carolina, alimony is granted for bodily injury inflicted or threatened and impending, amounting to the ssevitia of the civil law, which may be defined to be personal violence actually inflicted, or menaced, and affecting life or health.
*174 Alimony is also granted in South Carolina for the desertion of the wife by the husband. To these may be added a third class of cases, in which, though the husband has inflicted or threatened no bodily injury upon the wife, yet practices such obscene and revolting indecencies in the family circle, and so outrages all the sentiments of delicacy and refinement characteristic of the sex, that a modest and pure minded woman would find these grievances more dreadful and intolerable to be borne, than the most cruel inflictions upon her person, she would be held justifiable in fleeing from the polluting presence of that monster, with whom in an evil hour she had united her destinies. The Court would not hold her bound to such loathsome bondage, and would regard her as driven forth from the foul dwelling of the husband by a moral compulsion more irresistible and terrible than the fear of death. This doctrine and ground of relief find ample countenance and support in the earliest reported decisions of our Court of Equity upon the subject.
Except in cases embraced within the three classes above commented on, I am not aware that a suit for alimony has been sustained in South Carolina. The plaintiff has sought to bring her case within the principles of the second class. She charges desertion, as I have already shewn. The corresponding proceeding in the Ecclesiastical Court, is a suit for the restitution of conjugal rights. Our judicial records furnish no instance of a similar proceeding. In most of the States of this Union, the remedy for desertion is divorce, provided for by statute. The utter inefficacy of a judicial decree to restore harmonious relations to, and enforce the obligations of the married state, is the reason, I apprehend, why none of the States of this Union have adopted the proceeding of a suit for the restitution of conjugal rights, and why the most of the States have, by statutory enactments, allowed divorce as a remedy for desertion. The policy of this State has ever been against divorces. It is one of her boasts that no divorce has ever been granted in South Carolina. As no jurisdiction in *175 the State is authorized to grant divorces for any cause, and the Legislature has ever refused to exercise its supreme power for such a purpose, and no proceeding could be had for the restitution of conjugal rights, it became necessary for the Court of Equity to interpose, to afford relief for a great wrong, which would otherwise be without a remedy. Thus it is that our Courts of Equity have, from an early period, exercised the power of granting relief in cases of desertion of the wife by the husband. The relief granted is a decree for alimony, which is an allowance out of the estate of the husband'proportional to its value, to be paid to the wife at stated periods, during the separation.
The question is, whether the plaintiff has made out a case of desertion. That the defendant left her and removed to another State, is beyond controversy, and not denied. But did he leave her in an unjustifiable manner? Her own declarations in her bill shew that he most earnestly solicited her for years, to accompany him. His solicitations amounted to importunity. At length, upon her persistent, I may well say, obstinate refusal, he went alone — without his wife and child. Certainly the husband, by our laws, is lord of his own houseA hold, and sole arbiter on the question as to where himself and^ family shall reside. But she complains that before the marriage he entered into a solemn engagement, without which, the marriage would never have been solemnized, that he ■would not take her away from the immediate neighborhood of her mother without her consent. This promise, she says, was also made to her mother, without which, her assent would have been withheld. The defendant, in his answer, denies these allegations. But the evidence brings the charges home to him. My opinion is that he made the promises in the manner charged in the bill. But they created a moral'y obligation only. It may be conceded to be very dishonorable in him to commit a breach of the promises he made, in order to obtain the hand of his wife in marriage, and the consent of her friends to that union, and probably by those promises *176 induced them to waive a settlement of her property. Such a promise is a nullity. The contract of matrimony has its well understood and its well defined legal duties, relations and obligations, and it is not competent for the parties to interpolate into the marriage compact any condition in abridgment of the husband’s lawful authority over her person, or his claim to her obedience." ’ This fact, though proven, is not to be taken into consideration in determining the question, whether the plaintiff is entitled to the relief which she seeks. It is not a sufficient and distinct ground of itself for alimony,.nor is it entitled to be thrown into the scale as a make-weight, in aid of other grounds more legitimately taken, but not sufficiently made out by the proof.
Stripped of all extraneous matters, the simple question is, did the defendant desert his wife, the plaintiff? It must be a legal desertion. It is not every withdrawal of himself by the husband from the society of the wife that constitutes desertion in legal contemplation. The. conduct of the wife must be blameless. If she elopes, or commits adultery, or violates or omits to discharge any of the important hymeneal obligations which she has assumed upon herself, the husband may abandon her without providing for her support; and this Court would sustain him in such a course of conduct.
The husband has the right, without the consent of the wife, to establish his domicil in any part of the world, and it is the legal duty of the wife to follow his fortunes, wheresoever he may go. The defendant, in the exercise of his undoubted prerogative, had determined to make his domicil in the Parish of Bienville, in the State of Louisiana, and wished his wife to accompany him. She, preferring the society of hér mother and her relatives, refused to go — in opposition to his wishes, his importunate solicitations, his earnest entreaties. Considering the relative duties and obligations of husband and wife, as defined by the law, who, under these circumstances, is guilty of desertion? The wife, assuredly.
What I have said would' constitute a sufficient ground f6r *177 refusing the prayer of the bill. Yet, there is another additional and sufficient ground of defence on the part of the husband. Within a very short period after the filing of the bill, he returned to the State, for the purpose, I must believe, of inviting his wife to his new home, which he had established in the west. He twice visited her for this purpose. To these invitations, she gave a stern, angry, and insulting refusal. To the Court, in his answer, he renews these overtures, and offers ' to receive his wife in his new home, and to treat her with . conjugal aifection and tenderness. Under these circumstances \ the Court could not give alimony, even if he was wrong in ■,the beginning. Though alimony has been decreed, if the husband makes a bona fide offer to take back the wife whom he has deserted, and to treat her with conjugal kindness and affection, and the wife refuses, on application by the husband, the Court will, if satisfied of the sincerity of the husband’s offers, rescind the decree for alimony.
In considering this case, 1 have confined myself to the issues presented in the pleadings, to which I think the investigation should be restricted. On the trial, there was evidence introduced (some of which was of a very indelicate nature,) that was not pertinent to the allegations of the bill. This evidence has not been commented on in this opinion, but it has been considered. And I will say, that if there had been allegations and charges in the bill, to which this evidence would have been pertinent, it would not have varied the result of the case. Adultery, of itself, though it is a ground for divorce in the ecclesiastical courts, is no ground for alimony in this State.
It is ordered and decreed, that the Circuit decree be reversed, and that the bill be dismissed.
Dunkin, Ch. concurred.

Decree reversed.